**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

In re:  **ALAN R. STUART,**                    :         **Bky. No. 05-19154 (ELF)**
                                               :
           **Debtor.**                          :
                                               :
                                               :         **Chapter 13**
                                               :

# O P I N I O N

## I. INTRODUCTION

Prior to the commencement of this chapter 13 bankruptcy case, Homecomings Financial ("Homecomings")[1] obtained a state court judgment in mortgage foreclosure against Debtor Alan Stuart ("the Debtor") and his spouse.  The subject of the mortgage foreclosure judgment was the real property that serves as the home of the Debtor and his spouse ("the Residence").[2]  After the entry of the mortgage foreclosure judgment, the Debtor and his spouse notified Homecomings that they were rescinding the underlying mortgage loan transaction based on alleged material violations of the Truth in Lending Act, 15 U.S.C. §§1601 et seq. ("TILA").  At all times, Homecomings has contested the validity of the purported rescission of the mortgage.

The Debtor then filed this bankruptcy case and, eventually, obtained confirmation of his chapter 13 plan.  The Debtor's confirmed chapter 13 plan provides for the Debtor to litigate the

_____

[1]        The Debtor's confirmed chapter 13 plan refers to Homecomings as RFC Homecomings Financial sometimes shortening the entity name to "RFC."  According to it its filings, Homecomings was formerly known as RFC Homecomings Financial.  In this Opinion, I will refer to the entity as "Homecomings."

[2]        The Debtor's home is located at 579 Gramercy Lane, Downingtown, PA.

1

validity of the purported rescission in state court ("the State Court Rescission Litigation"), for

Homecomings' claim to be paid "outside the plan" after the conclusion of that litigation and for

the automatic stay to remain in place with respect to the mortgage on the Residence until the

"resolution" of the State Court Rescission Litigation.

Several months after plan confirmation, Homecomings obtained judgment on the

pleadings in the State Court Rescission Litigation at the trial court level.  The Debtor has

appealed that decision to the Pennsylvania Superior Court.

Following its trial court victory in the State Court Rescission Litigation, Homecomings

filed a motion for relief from the automatic stay in this court ("the Stay Relief Motion"), seeking

permission to complete foreclosure proceedings against the Residence.  Homecomings asserted

that:

>    (1) its interest in the Residence was not adequately protected because the Debtor
>    has failed to make instalment payments on the mortgage since confirmation; and,

>    (2) under the terms of the Debtor's confirmed chapter 13 plan, the automatic stay
>    had expired because the State Court Rescission Litigation had reached
>    "resolution."

In response, the Debtor argued that:

>    (1) the State Court Rescission Litigation had not reached a "resolution" due to the
>    pendency of his appeal of the trial court decision; and,

>    (2) granting relief would violate the terms of his confirmed plan.

This court entered an order denying the Stay Relief Motion.  Presently before the court is

Homecomings' Motion for Reconsideration ("the Reconsideration Motion").

As explained more fully below, I find it appropriate to reconsider the merits of the order

denying the Stay Relief Motion.  On the merits, the parties' dispute presents the issue whether the

2

Debtor's confirmed chapter 13 plan, binding on Homecomings under 11 U.S.C. §1327(a),

categorically precludes Homecomings from obtaining relief from the automatic stay under 11

U.S.C. §362(d)(1) prior to "resolution" of the State Court Rescission Litigation.

Based on my interpretation of the Debtor's confirmed plan, I find that the plan does not

supersede the conventional application of §362(d)(1).  Because Homecomings has established a

prima facie case for relief from the automatic stay under §362(d)(1) and the Debtor has not

rebutted Homecomings' case, Homecomings is entitled to the relief it seeks..


## II.  BACKGROUND

### A.    Pre-Bankruptcy: the Mortgage, State Court Foreclosure Judgment and Purported Rescission

On January 26, 2004, the Debtor and his spouse, Elizabeth T. Stuart, entered into a

residential real estate mortgage loan transaction with Homecomings' predecessor-in-interest with

respect to the Residence.  Following their default on the mortgage, foreclosure proceedings were

initiated in the Court of Common Pleas, Chester County ("the CP Foreclosure Court") on

February 28, 2005.  The CP Foreclosure Court entered a default judgment against the Debtor on

April 20, 2005.  The Debtor's residence was then scheduled to be sold at a sheriff's sale.

On May 9, 2005, after the entry of the CP Foreclosure Court judgment, the Debtor sent a

letter purporting to exercise his right to rescind the loan agreement based on alleged material

violations of the Truth in Lending Act, 15 U.S.C. §§1601 et seq. ("TILA").

**B.    The Debtor's Bankruptcy, Chapter 13 Plans, the Bankruptcy Court Rescission Litigation and the State Court Rescission Litigation**

### 1.  the First Plan

The Debtor filed a voluntary petition under chapter 13 of the Bankruptcy Code on July 6, 2005.  The filing stayed the scheduled sheriff's sale of the Debtor's residence.

On the same day that he filed his chapter 13 petition, the Debtor filed a chapter 13 plan ("the First Plan").  The key elements of the First Plan were:

- the Debtor would pay the Chapter 13 Trustee $50.00 a month for 36 months. First Plan ¶2.

- the Debtor and his spouse would initiate an adversary proceeding to enforce their right to rescind their mortgage.  Id. ¶3.

- the Debtor would "make at least partial post-petition mortgage payments to RFC" to protect its interest in the property during the pendency of the litigation.  Id.

- the Debtor's plan payments to the chapter 13 trustee would be distributed first, to the Class One administrative claimants until they were paid in full, second, to Homecomings with respect to its filed claim,[3] and last, to any other allowed general unsecured claimants.  Id. ¶5.

- the automatic stay would remain in effect until the case was closed and following confirmation, "relief [from stay] shall be granted only for a material violation of the t[e]rms of payment to the trustee under the terms of the plan." Id. ¶8.[4]

---

[3]      On November 10, 2005, Homecomings filed a proof of claim asserting a claim secured by the Debtor's primary residence.  The claim totaled $396,491.16 with prepetition arrears of $32,426.14.  See Claims Register No. 9.

[4]      Paragraph 9 of the First Plan provided that upon completion of the plan, all dischargeable debts will be discharged.  It also stated that the "Debtor anticipates that his claims against RFC will result in a resolution pursuant to which [he] will make payments in the future only."  The meaning of this sentence is unclear in light of Paragraph 3, which provides for "partial post-petition mortgage payments."

### 2. the Bankruptcy Court Rescission Litigation and the Amended Plan

On July 13, 2005, the Debtor and his spouse instituted an adversary proceeding (Adv. No. 05-0459) ("the Bankruptcy Court Rescission Litigation"), against Homecomings and two (2) other parties[5] seeking, inter alia, to enforce their rescission of the mortgage transaction pursuant to TILA.

On November 14, 2005, the Debtor filed an Amended Chapter 13 Plan ("the Amended Plan").  See Docket Entry No. 22.  The Amended Plan included the following changes to the First Plan, providing (or stating) that:

- the Debtor would pay the chapter 13 trustee $200.00/month through November 2005 and $180.00/month for the remaining 56 months of the plan.  Amended Plan ¶2.

- the Debtor and his spouse had filed an adversary proceeding to enforce their right to rescind their mortgage. Amended Plan ¶3.

- the Debtor and his spouse had "been unable to make even partial post-petition mortgage payments to [Homecomings]" and anticipated that "their claims against [Homecomings would] eliminate all of their arrears and other obligations owed to this creditor." Id.

On April 6, 2007, this court granted summary judgment in favor of Homecomings on the TILA rescission claim asserted in the Bankruptcy Court Rescission Litigation because it lacked subject matter jurisdiction under the Rooker-Feldman doctrine.  See In re Stuart, 367 B.R. 541 (Bankr. E.D. Pa. 2007).  The dismissal was without prejudice to the right of the Debtor and his spouse to assert their TILA rescission claim in a court of competent jurisdiction.

---

[5]    The two (2) other parties were alleged to be Homecomings' predecessor-in-interest as mortgage holder and the mortgage broker for the loan transaction.

### 3. the State Court Rescission Litigation and the Confirmed Plan

On May 10, 2007, following the dismissal of the TILA rescission claim by the bankruptcy court, the Debtor and his spouse instituted a state court action in the Pennsylvania Court of Common Pleas, Chester County ("the C.P. Rescission Court"), again asserting their right to rescind the mortgage transaction under TILA.

On October 9, 2007, the Debtor filed a Second Amended Chapter 13.  See Docket Entry No. 87.  This plan differed from the Amended Plan in that it:

- provided that the Debtor would make plan payments to the chapter 13 trustee of $50.00/month for the first four months and $178.57/month for the remaining 56 months of the plan.  Second Amended Plan ¶2.

- stated, for the first time, that the automatic stay as to Homecomings would remain in effect until the validity of the purported mortgage rescission had been litigated to "resolution."  See id. ¶3.

- no longer made any mention of post-petition payments to Homecomings during the pendency of the State Court Rescission Litigation.

- did not provide for any distribution to Homecomings by the Chapter 13 Trustee, stating that the Trustee would make distributions only to the holders of administrative expenses and allowed unsecured claims.  See id. ¶¶4-5.[6] Instead, any payments "found to be due" to Homecomings would be made by the Debtor directly "outside the plan."  Id. ¶3.

No objections were filed to confirmation of this plan and the Chapter 13 Trustee recommended confirmation.  By order dated November 13, 2007, the court confirmed the Second Amended Chapter 13 Plan (hereinafter "the Confirmed Plan" or "the Plan").  See Docket Entry

---

[6]       Additionally, the last sentence of ¶9 of the Confirmed Plan differed from ¶9 of the First Plan.  The Second Amended Plan stated: "the only payments due to [Homecomings] after discharge will be those determined to be due this party."  The previous version provided: "the only payments due to [Homecomings] after discharge will be the Debtor's regular monthly payments."  This modification is not material to the present dispute.

No. 91.

The Confirmed Plan remains in effect and is the subject of the parties' dispute.

The plan provision most critical to the current dispute is Paragraph 3.  Paragraph 3 sets

forth the Debtor's proposed treatment of Homecomings' secured claim:

> 3.  In addition the Debtor and his spouse ("the Borrowers") have filed an action in the Court of Common Pleas of Chester County to enforce their right to rescind a loan secured by a first mortgage on her home held by Decision One Mortgage, which they are advised was assigned to RFC Homecomings Financial American ("RFC").  The Borrowers will make any payments which are found to be due to RFC directly, outside of the plan.  **However, the automatic stay will remain in effect as too [sic] RFC to prevent the Borrowers from losing their residence proior [sic] to resolution of the validity of the rescission**.

Confirmed Plan ¶3 (emphasis added).

In addition, as will be elaborated below, Paragraph 8 is of some relevance.  It provides:

> The automatic stay shall remain in full force and effect until this case is closed. After confirmation of the plan, relief shall be granted only for a material violation of the terms of payment to the trustee under the terms of the plan and only after a motion and notice and a hearing thereon.

Confirmed Plan ¶8.


**C.      Homecomings' Stay Motion and the Reconsideration Motion**

During the course of this case, Homecomings filed three (3) post-confirmation motions

for relief from the automatic stay.  The Stay Relief Motion presently before the court, filed on

August 8, 2008, is the third of the three (3) motions.[7]  See Docket Entry No. 111.

--------

[7]      The first Motion for Relief from the Automatic Stay ("the First Motion"), filed on December 13, 2007, was based on the Debtor's failure to make pre-confirmation monthly mortgage payments to Homecomings.  The court denied the First Motion on the ground that the Confirmation Order precluded relief based on events occurring prior to the confirmation hearing.  See Order dated

7

In the Stay Relief Motion, Homecomings asserted that it was entitled to relief from the automatic stay for two (2) reasons.  First, Homecomings asserted that "cause" existed to lift the automatic stay under 11 U.S.C. §362(a)(1) because it lacked adequate protection of its property interest due to the Debtor's ongoing failure to make monthly post-confirmation mortgage payments or any form of adequate protection payments.  Second, Homecomings argued that, under the terms of the Confirmed Plan, the automatic stay had expired pursuant to Paragraph 3 of the Confirmed Plan because the State Court Rescission Litigation had come to a "resolution" due to the entry of the judgment on the pleadings in its favor by the C.P. Rescission Court.[8]

In his response to the Stay Relief Motion, the Debtor reported that he had appealed the C.P. Rescission Court's decision.  He argued that, due to the pendency of the appeal, no

February 5, 2008 (Docket Entry No. 103) (citing In re Owens, 132 B.R. 293 (Bankr. E.D. Pa. 1991); In re Reice, 88 B.R. 676 (Bankr. E.D. Pa. 1988); In re Wright, 54 B.R. 553 (Bankr. E.D. Pa. 1985); In re Clark, 38 B.R. 683 (Bankr. E.D. Pa. 1984); In re Pizzulo, 33 B.R. 740 (Bankr. E.D. Pa. 1983)); accord In re Brunson, 2008 WL 4861515 (Bankr. E.D. Pa. Nov. 6, 2008).

The second motion for relief from stay ("the Second Motion") was filed on March 4, 2008.  In the Second Motion, Homecomings alleged that cause for relief existed because the Debtor had failed to pay county real estate and school taxes on the property for the years 2005 through 2007, rendering the property vulnerable to a possible tax sale.  On April 11, 2008, the court denied the Second Motion, without prejudice to Homecoming's ability to relist it in the future, because there was no evidence of any imminent threat of a tax sale based on the delinquent taxes.  See Docket Entry No. 109; N.T. 4/10/2008, 10:54.  (The notes of testimony were not transcribed; the citation is to the audio transcript by reference to the "date," and "hour : minute").

[8]    To its credit, Homecomings did not take unilateral action based on its view that the automatic stay has expired pursuant to Paragraph 3 of the Confirmed Plan.  Apparently recognizing that some uncertainty existed, it filed the Stay Relief Motion to obtain a judicial determination of the issue.  See generally In re Daniels, 316 B.R. 342, 352-53 (Bankr. D. Idaho 2004) (if there is uncertainty regarding scope of court order or automatic stay, "prudent course" is for creditor to seek judicial determination); In re Clark, 49 B.R. 704, 707 (Bankr. D. Guam 1985) ("Where there is uncertainty about an order of the Bankruptcy Court, or applicability of the automatic stay, a creditor should petition the court for clarification").

8

"resolution" of the validity of the purported mortgage rescission had occurred and therefore, relief from the stay was precluded by the terms of the Confirmed Plan.  See Debtor's Response to Motion for Relief from Stay ¶3, (Docket Entry No. 114).

A hearing on the Stay Relief Motion was held on August 28, 2008.  At the hearing, the Debtor, through his counsel, did not controvert Homecomings' allegation that he had made no mortgage payments since the entry of the Confirmation Order and reported further that he was unable to make prospective, periodic, adequate protection payments to Homecomings.  N.T. 8/28/2008, 11:03.  Both the Debtor and Homecomings concentrated their arguments on the question whether the state court rescission litigation had reached a "resolution" within the meaning of Paragraph 3 of the Confirmed Plan.

By Order dated August 28, 2008, the court denied the Stay Relief Motion.  No opinion accompanied the Order.

On September 15, 2008, Homecomings filed the Reconsideration Motion.  See Docket Entry No. 118.  On October 21, 2008, the Court held a hearing and, after its conclusion, took the matter under advisement.

### III.  FED. R. BANKR. P. 9023 AND FED. R. CIV. P. 59(e)

In federal practice, the rules of court do not expressly provide for a "motion for reconsideration."  Nevertheless, such motions are filed frequently and, if timely (i.e. filed no later than 10 days after the entry of judgment), are treated as motions to alter or amend a judgment under Fed. R. Civ. P. 59(e), made applicable to bankruptcy cases by Fed. R. Bankr. P. 9023.  See U.S. v. McGlory, 202 F.3d 664, 668 (3d Cir. 2000); In re Myers, 2007 WL 2428694, at *3-4

(Bankr. E.D. Pa. Aug. 22, 2007); see also Villanueva-Mendez v. Nieves Vazquez, 360 F. Supp.

2d. 320, 323 (D.P.R. 2005), aff'd, 440 F.3d 11 (1st Cir. 2006).  In this case, the Reconsideration

Motion was timely under Rule 59(e).[9]

A motion for reconsideration is an extraordinary remedy that should be granted sparingly.

See, e.g., Env't'l. Tectonics Corp. v. Walt Disney World Co., 2008 WL 2405751, at *1 (E.D. Pa.

June 13, 2008); accord In re Kuhar, 2007 WL 2245912, at *2 (Bankr. E.D. Pa. Aug. 1, 2007).  It

"is not to be used as a means to reargue matters already argued and disposed of or as an attempt

to relitigate a point of disagreement between the Court and the litigant."  Hill v. Tammac Corp.,

2006 WL 529044, at *2 (M.D. Pa. Mar. 3, 2006) (quoting Ogden v. Keystone Residence, 226 F.

Supp. 2d 588, 606 (M.D. Pa. 2002)).  Rather, a proper motion to alter or amend a judgment must

be based on at least one (1) of the following three (3) grounds:

> (1) an intervening change in controlling law;
>
> (2) new evidence not previously available; or
>
> (3) the need to correct a clear error of law or fact or prevent manifest injustice.

See North River Ins. Co. v. Cigna Reinsurance Co., 52 F.3d 1194, 1218 (3d Cir. 1995); Harsco

Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1985); Allen v. J.K. Harris & Co., 2005 WL

2902497, at *1 (E.D. Pa. Nov. 2, 2005).

If a movant fails to establish one of these grounds, a Rule 59(e) motion should be denied.

Am. Registry of Radiologic Technologists v. Garza, 512 F. Supp. 2d 902, 904 (S.D. Tex. 2007).

---

[9]    For some reason, perhaps because it was signed just prior to the Labor Day Weekend, the August 28, 2008 Order denying the Stay Relief Motion was not entered until September 3, 2008.  See Docket Entry No. 116.  Thus, the Reconsideration Motion, filed on September 15, 2008, was timely filed under Rule 59(e).  See Fed. R. Bankr. P. 9006(a) (in computing time, if the last day of the time period is a Saturday, Sunday or legal holiday, "the [time] period runs until the end of the next day which is not one of the aforementioned days").

Furthermore, even if the movant successfully proves the existence of one of these grounds, the

court "has considerable discretion to determine whether reconsideration of its judgment is

warranted."  Id.  Ultimately, the court's task is to balance the interest of finality with the interest

that a just result be achieved.  Day v. The Krystal Co., 241 F.R.D. 474, 476 (E.D. Tenn. 2007);

Jacobs v. Elec. Data Sys. Corp., 240 F.R.D. 595, 600 (M.D. Ala. 2007).


## IV.  DISCUSSION

### A.  Summary

As elaborated below, I conclude that I committed an error of law warranting

reconsideration and reversal of the initial decision to deny the Stay Relief Motion.  See, e.g.,

Motor Vehicle Mfrs. v. New York State Dep't of Envtl. Conservation, 831 F. Supp. 57, 60-61

(N.D.N.Y 1993) (in exercising discretion to reconsider previous order, court reversed grant of

summary judgment based on its failure to properly consider relevant evidence which had material

effect on its ruling), aff'd in part, rev'd in part, 17 F.3d 521 (2d Cir. 1994); Atl. States Legal

Found. v. Karg Bros. Inc., 841 F. Supp. 51, 55 (N.D.N.Y 1993) (reconsideration was warranted

where ruling was premised upon court's misunderstanding of regulatory scheme).

I denied the Stay Relief Motion because I construed the word "resolution," as used in the

context of the automatic stay provision of Paragraph 3 of the Confirmed Plan, to encompass

exhaustion of all appeals.  Applying that meaning, I concluded that the automatic stay did not

terminate upon the entry of judgment on the pleadings in Homecomings' favor in the C.P.

11

Rescission Court.[10]  However, by focusing exclusively on the issue emphasized by the parties at

the hearing on the Stay Relief Motion (i.e., whether the State Court Rescission Litigation had

reached "resolution" by the entry of the judgment in Homecomings' favor in the C.P. Rescission

Court), I overlooked the other, more traditional ground for relief asserted by Homecomings – that

it lacked adequate protection of its interest in property, providing cause for relief under 11 U.S.C.

§362(d)(1).  My determination that the stay did not expire under Paragraph 3 of the Confirmed

Plan did not necessarily answer the question whether the Confirmed Plan prevented the

automatic stay from being terminated for some reason unrelated to the resolution of the State

Court Rescission Litigation, such as the lack of adequate protection or other "cause" under

§362(d)(1).  In other words, I failed to consider whether the grounds for relief from the stay

described in Paragraph 3 ("resolution" of the State Court Rescission Litigation) as well as

Paragraph 8 (material default in the Debtor's payment obligations to the Chapter 13 Trustee)

provide the exclusive bases for termination of the stay as to Homecomings or, instead, whether

the Confirmed Plan also permits  Homecomings to obtain relief from the automatic stay for

"cause" under 11 U.S.C. §362(d)(1).

   With the issue now properly framed, I conclude that:

> (1) Paragraph 3 and Paragraph 8 of the Confirmed Plan, properly construed, do
> not provide the exclusive bases for granting relief from the automatic stay to
> Homecomings;

---

[10]    As explained below, I now resolve this matter on entirely different grounds.  Therefore,
it is not necessary to elaborate my reasons for construing the word "resolution" in Paragraph 3 in this
manner or to decide whether I adhere to that view after consideration of the Reconsideration Motion.  I
mention it in the text above only to place my decision to reconsider the merits of the Order denying the
Stay Relief Motion in its proper historical and procedural context.

(2) Homecomings lacks adequate protection of its interest in the Residence within the meaning of 11 U.S.C. §362(d)(1); and

(3) Homecomings is entitled to the relief from the automatic stay for "cause" under §362(d)(1).[11]

## B.  The Duration of the Automatic Stay After Plan Confirmation: General Principles

Before examining the Confirmed Plan to determine the scope and meaning of its provisions addressing the post-confirmation automatic stay, it is helpful to consider the legal framework within which these provisions operate.  I begin by considering what might be characterized as "the statutory default," i.e., the legal principles that would govern the duration of the automatic stay if the Confirmed Plan were silent on the subject.  This backdrop is helpful in interpreting the meaning of the provisions of  the Confirmed Plan presently at issue.

### 1.

The statutory starting points are 11 U.S.C. §362(c) and (d).

Under 11 U.S.C. §362(c)(1), the stay against property of the estate terminates as to a

---

[11]    In the Reconsideration Motion, one of the grounds upon which Homecomings sought reconsideration was that Paragraph 3 of the Confirmed Plan violated 11 U.S.C. §362(d)(1) and was therefore, unenforceable based on due process principles, including those set forth in the Court of Appeals' decision in In re Mansaray-Ruffin, 530 F.3d 230 (3d Cir. 2008).  See Reconsideration Motion ¶¶19-28.  While I agree with Homecomings that it is entitled to relief under §362(d)(1), my decision is based on my interpretation of the Confirmed Plan and not on constitutional grounds.  Therefore, I express no opinion on Homecomings' constitutional arguments.  In effect, this decision is based upon an argument Homecomings made in the Stay Relief Motion but not specifically reiterated in the Reconsideration Motion.  In reconsidering the Order denying the Stay Relief Motion, I am not strictly limited to matters raised on reconsideration.  Rather, it is within my discretion to reconsider an order on any basis where I perceive an error was made. Varley v. Tampax, Inc., 855 F.2d 696, 699-700 (10th Cir. 1988); Charles v. Daley, 799 F.2d 343, 347 (7th Cir. 1986); Arnold v. Sullivan, 131 F.R.D. 129, 134 (N.D. Ind. 1990).

specific asset when that asset ceases to be property of the estate.  Under §362(c)(2), the stay of

any other act governed by §362(a) continues until the earlier of the closing, dismissal or entry of

a discharge in a chapter 13 case.[12]

Of course, even before the "natural" expiration of the stay under §362(c)(1) or (2), the

stay may be terminated under 11 U.S.C. §362(d) upon request of a party in interest after notice

and a hearing.  Perhaps the most common basis for such requests is relief  "for cause, including

the lack of adequate protection of an interest in property of [a] party in interest."  Id. §362(d)(1).

Under §362(d)(1), evidence of a debtor's post-petition default in mortgage payments meets a

mortgagee's initial burden of production in establishing "cause" for relief.  The burden then

shifts to the debtor to rebut the creditor's prima facie case, such as by establishing that the

creditor's interest is "adequately protected."  See, e.g., In re Dupell, 235 B.R. 783, 789 (Bankr.

E.D. Pa. 1999); In re Hinchliffe, 164 B.R. 45, 48-49 (Bankr. E.D. Pa. 1994); In re Morysville

Body Works, Inc., 86 B.R. 51, 57-58 (Bankr. E.D. Pa. 1988); In re Skipworth, 69 B.R. 526, 527-

28 (Bankr. E.D. Pa. 1987); see also 11 U.S.C. §362(g)(2) (burden of proof on adequate

protection is on the party opposing relief).

---

[12]     Section 362(c) provides:

>      Except as provided in subsections (d), (e), (f), and (h) of this section —
>           (1) the stay of an act against property of the estate under subsection (a)
>           of this section continues until such property is no longer property of the
>           estate;
>           (2) the stay of any other act under subsection (a) of this section
>           continues until the earliest of —
>                (A) the time the case is closed;
>                (B) the time the case is dismissed; or
>                (C) if the case is a case under chapter 7 of this title concerning
>                an individual or a case under chapter 9, 11, 12, or 13 of this title,
>                the time a discharge is granted or denied .  .  .  .

**2.**

Confirmation of a chapter 13 plan affects the application of both 11 U.S.C. §362(c) and

(d)(1).  The impact is caused by the operation of 11 U.S.C. §1327(b).

Section 1327(b) states that "[e]xcept as otherwise provided in the plan or the order

confirming the plan, the confirmation of a plan vests all of the property of the estate in the

debtor."  Under §1327(b), if a confirmed plan or the confirmation order does not "otherwise

provide," property of the estate vests in the debtor upon confirmation.

Section 1327(b) brings §362(c)(1) into play and terminates the automatic stay as to acts

against property of the estate that vested in the debtor at confirmation.  However, that does not

mean that the former estate property (now revested in the debtor) is left unprotected.  With

respect to prepetition claims, most courts hold that even though the automatic stay is no longer in

effect with respect to acts against property of the estate after confirmation of a chapter 13 plan by

virtue of §362(c)(1), the stay remains in effect with respect to acts against property of the debtor

under §362(c)(2) – as long as the bankruptcy case has not been closed or dismissed and the

debtor has not received a discharge.[13]

---

[13]     See In re Whigham, 195 B.R. 667, 671 (E.D. Mich. 1996); In re Camacho, 311 B.R. 186,
191-92 (Bankr. E.D. Mich. 2004); In re Davenport, 268 B.R. 159, 165 (Bankr. N.D. Ill. 2001); In re
Stewart, 190 B.R. 846, 853 (Bankr. C.D. Ill. 1996); In re Burgess, 163 B.R. 726, 728 -29 (Bankr. M.D.
Pa. 1993); In re Littke, 105 B.R. 905, 909 (Bankr. N.D. Ind. 1989); In re Hartley, 75 B.R. 394, 397 (S.D.
Ala. 1987), vacated on other grounds, 80 B.R. 230 (S.D. Ala. 1987); 3 Keith M. Lundin, Chapter 13
Bankruptcy §243 (3d ed. 2004) ("Lundin").

The rationale of these decision is as follows:

There are eight subparts to the automatic stay in § 362(a).  Some of the
components prohibit acts against the debtor, some prohibit acts against property
of the debtor and some prohibit only acts against property of the estate.  Some
parts of the stay concern only claims that arose before the commencement of the
case; other prohibitions apply without regard to whether the debt arose before or

In this case, because neither the Confirmed Plan nor the confirmation order "otherwise provide," the Residence vested in the Debtor upon confirmation of the Plan.  Therefore, even if the Confirmed Plan had not addressed the subject of the post-confirmation automatic stay, the automatic stay would nonetheless have remained in place due to §362(c)(2) and would have restrained Homecomings from resuming foreclosure proceedings after confirmation of the Plan.  See 11 U.S.C. §362(a)(1), (2), (5), (6).

As stated earlier, confirmation of a chapter 13 plan and 11 U.S.C. §1327(a) also affect the operation of 11 U.S.C. §362(d)(1).

If a confirmed plan "provides for" a secured claim – either by providing for full payment of the allowed secured claim[14] or payments to cure the prepetition arrears[15] – relief from the automatic stay will not be granted after confirmation of a chapter 13 plan: (1) based on events occurring prior to confirmation or a creditor's dissatisfaction with its treatment under the plan (including a contention that the treatment under the plan does not provide the creditor with

---

after the petition.  Section 362(c)(1) terminates the automatic stays described in §362(a), but only with respect to acts "against property of the estate."  Section 362(c)(1) has no effect on the subsection of § 362(a) that prohibit acts against "property of the debtor."

3 Lundin §243, at 243-3 (emphasis in original).

[14]    See 11 U.S.C. §1325(a)(5)(B); In re Bryant, 323 B.R. 635, 645 (Bankr. E.D. Pa. 2005); see generally Till v. SCS Credit Corp., 541 U.S. 465, 468-469, 124 S. Ct. 1951, 1955 (2004) (discussing the methodology for determining the present value of a secured claim being paid in full through a stream of plan payments).

[15]    See 11 U.S.C. §1322(b)(5); Sapos v. Provident Inst. of Sav., 967 F.2d 918, 922 (3d Cir. 1992) (referring to §1322(b)(5) as a "cure and maintain" alternative to full payment of a secured claim). The Supreme Court has held that treating a secured claim under §1322(b)(5) constitutes "providing for" the claim in a chapter 13 plan.  See Rake v. Wade, 508 U.S. 464, 473, 113 S. Ct. 2187, 2192 (1993).

16

"adequate protection") or (2) because the creditor could have defeated confirmation with a timely

objection. Generally, relief from the automatic stay is available to a secured creditor provided for

in the plan only if the debtor defaults in his or her performance obligations under the plan. See,

e.g., n.13, supra; n.17, infra; 3 Lundin §242.1, at 242-5, §244.1; accord Brunson, 2008 WL

4861515, at *1; Pizzulo, 33 B.R. at 742.

Another scenario involves the confirmation of a chapter 13 plan in which the debtor

chooses to "not provide for" a secured claim at all, in which case the claim and the lien pass

through the bankruptcy case unaffected.[16] If a confirmed plan does not "provide for" a secured

claim, the holder of the claim ordinarily is entitled to obtain relief from the automatic stay for

cause under 11 U.S.C. §362(d). See In re Evans, 66 B.R. 506, 510 (Bankr. E.D. Pa. 1986)

("Being dealt with 'outside' the Plan may make it quite easy for the secured claimant to obtain

relief from the automatic stay, and hence proceed exactly as if there had been no filing"), aff'd,

77 B.R. 457 (E.D. Pa. 1987); accord In re Vincente, 260 B.R. 354, 356-58 (Bankr. E.D. Pa.

2001); 8 Collier ¶1325.06[1][b], at 1325-29 (15th rev. ed. 2007).[17]

---

[16]    See In re Waldman, 75 B.R. 1005, 1007 (Bankr. E.D. Pa. 1987); 8 Collier on Bankruptcy
¶1325.06[1][b] (15th rev. ed. 2007) ("Collier"); see generally Lellock v. Prudential Ins. Co., 811 F.2d 186,
189 (3d Cir. 1987) (even though underlying debt is discharged, lien created by the debt is not affected by
the discharge order); Matter of Tarnow, 749 F.2d 464 (7th Cir. 1984) (a creditor's lien is not affected by
the bankruptcy discharge, unless the lien is modified during the case pursuant to a specific Code
provision, such as 11 U.S.C. §§522(f) or 1322(b)(2)).

[17]    While the authorities cited in the text do not provide an extended explanation why a
secured creditor whose claim is not provided for in a chapter 13 plan should be able to obtain relief from
the automatic stay after confirmation, the rationale is straightforward. In a rehabilitation or
reorganization case, one of the primary purposes of the automatic stay is to provide the debtor with an
opportunity "to attempt a repayment or reorganization plan." Maritime Elec. Co. Inc. v. United Jersey
Bank, 959 F.2d 1194, 1204 (3d Cir. 1991). Once a debtor's chapter 13 plan has been confirmed, that
initial purpose has been fulfilled. The stay needs to remain in place to permit the debtor to implement the
confirmed plan by performing his obligations thereunder. Thus, the stay will remain in place so long as
the debtor performs his or her obligations under the confirmed plan. See, e.g., In re Matthews, 229 B.R.

To summarize, if a confirmed plan provides for the payment of a secured claim under 11 U.S.C. §1322(a)(5)(B) or 11 U.S.C. §1322(b)(2) but does not address the duration of the automatic stay, the stay will remain in place so long as the debtor performs his obligations under the plan.  If the confirmed plan does not provide for a secured claim, relief from the stay ordinarily will be granted upon request of the creditor.  At the risk of oversimplifying, confirmation of a chapter 13 plan that provides for a secured claim replaces a secured creditor's right to relief from the automatic stay for "cause, including adequate protection" under §362(d)(1) with the debtor's performance obligations under the confirmed plan.  If the confirmed plan does not provide for the secured creditor's claim, the creditor has a prima facie case for relief from the stay.[18]

## 3.

In this case, as described above, the Confirmed Plan provides for the Debtor to litigate the validity of Homecomings' secured claim in a nonbankruptcy forum, after which the Debtor states that he "will make any payments which are found to be due to [Homecomings] directly, outside the plan."  No specific repayment terms are described by the Confirmed Plan, however. Consequently, I must decide whether the Confirmed Plan "provides for" Homecomings' secured claim within the meaning of the legal authorities that state that the holder of a claim "not

---

324, 328 (Bankr. E.D. Pa. 1999); accord In re Humphrey, 309 B.R. 777, 780 n.2 (Bankr. W.D. Mo. 2004).  If, however, the debtor's plan does not provide for the repayment of a secured claim, ordinarily, no valid rehabilitative or reorganization purpose is served by continuing to restrain the creditor from collecting its claim by realizing its security.

[18]     Nothing in this discussion addresses the effects on the automatic stay of confirmation of a plan that provides for a secured claim under 11 U.S.C. §1325(a)(5)(C).

provided for" under a chapter 13 plan is ordinarily entitled to relief from the automatic stay.

In <u>Rake v. Wade</u>, the Supreme Court described the concept of "providing for" a claim in relatively broad terms, stating that the "phrase is commonly understood to mean that a plan 'makes a provision' for, 'deals with,' or even 'refers to' a claim." 508 U.S. at 474, 113 S. Ct. at 2193. However, despite the seemingly broad language in <u>Rake</u>, the case involved a plan that included a provision for paying the prepetition arrears on the secured claim at issue. Indeed, in holding that the prepetition mortgage arrears constituted a claim entitled to be paid with interest under §1325(a)(5), the <u>Rake</u> Court emphasized that the arrears were "provided for" because the plan established a "repayment schedule[ ]" for its satisfaction. <u>Id.</u> at 473, 113 S. Ct. at 2192.

I do not find the discussion in <u>Rake</u> binding in the circumstances before me. The issue in <u>Rake</u> was whether mortgage arrears being provided for in a chapter 13 plan under 11 U.S.C. §1322(b)(5) constitute a claim for purposes of §506(c) and whether the creditor was entitled to "interest on arrears " pursuant to §506(b). The issue did not relate in any way to the operation of the automatic stay after confirmation of a chapter 13 plan. Therefore, in the instant case, where there are no terms for repayment of Homecomings' claim and the Plan itself states Homecomings' claim will be paid "outside" the Plan, it is doubtful that the mere reference in the Confirmed Plan to the future payment of Homecomings' claim at some indeterminate time in the future and without concrete terms regarding payment amount, frequency and term, constitutes "providing for" the claim in the plan in a manner that binds the creditor, for stay relief purposes, to the treatment afforded in the Plan.

In these circumstances, and for purposes of 11 U.S.C. §362(d)(1), I hold that the Confirmed Plan does not provide for Homecomings' claim. In this context, the concept of "not

19

providing for" a claim means only that the nature of the Confirmed Plan's treatment of the claim is such that the holder has a presumptive right to relief from the automatic stay, upon request, after confirmation.

The result, then, is that if the Confirmed Plan had not addressed the subject of the post-confirmation automatic stay, the automatic stay would have remained in effect after confirmation – but Homecomings would have grounds to request relief from the stay under §362(d)(1) following confirmation because the Plan did not provide for its claim.[19]

With this background, I now examine the Confirmed Plan in this case, to determine if its provisions alter the outcome that would otherwise obtain under 11 U.S.C. §362(d)(1).

## C.  The Confirmed Plan Does Not Override 11 U.S.C. §362(d)(1)

### 1.

The Confirmed Plan addresses the automatic stay in two (2) paragraphs, Paragraph 3 and Paragraph 8.  A third provision of the Confirmed Plan, Paragraph 9, also may have some bearing on the issue at hand.

---

[19]      In this case, Homecomings prima facie case under §362(d)(1) is strengthened further by the undisputed fact that the Debtor has not been making post-confirmation monthly mortgage payments. Query whether a secured creditor whose claim is not provided for in a confirmed chapter 13 plan, but who nevertheless is receiving periodic payments from the debtor sufficient to provide adequate protection of its interest, may obtain relief from the automatic stay after confirmation under §362(d)(1)? This case does not present that issue.  Nor has the Debtor come forward with other evidence to rebut Homecomings' prima facie case for relief from the stay (e.g., the existence of a substantial equity cushion).  The Debtor argues only that the Confirmed Plan changes the rules of the game, overrides §362(d)(1) and precludes Homecomings from obtaining relief despite the absence of periodic payments and the lack of adequate protection.

Paragraph 3 consists of three (3) sentences.[20]  The first sentence is merely a factual recitation: that the Debtor has instituted the State Court Rescission Litigation.  The second sentence is a statement of future of intention: that the Debtor's intends to make payments in the future, i.e., payments that "are found to be due" to Homecomings.[21]  The third sentence states that the automatic stay "will remain in effect" as to Homecomings to prevent the Debtor from losing the Residence prior to "resolution" of the State Court Rescission Litigation.

Paragraph 8 consists of two (2) sentences.  The first sentence states that the automatic stay will remain in effect "until this case is closed."  The second sentence states that relief from the automatic stay may be granted only for a material "violation" of the Debtor's payment obligation to the trustee under the Confirmed Plan.

Paragraph 9 consists of three sentences.[22]  The first sentence is not relevant here.  The second sentence states the Debtor's expectation that the State Court Rescission Litigation will result in a resolution pursuant to which he "will make payments in the future only."  The third sentence refers to the parties post-discharge relationship, stating that the only payments that the

---

[20]     The text of Paragraph 3, as well as Paragraph 8, is quoted in full in Part II.B.3, supra.

[21]     Presumably, this sentence is referring to the State Court Rescission Litigation and describes the Debtor's intention to pay any amounts that are found to be due to Homecomings after the conclusion of the litigation.

[22]     Paragraph 9 states:

> Upon completion of this or any other duly confirmed plan, all other debts listed in the Debtor's schedules or provided for by this Plan which are dischargeable shall be discharged. The Debtor anticipates that his claims against RFC will result in a resolution pursuant to which they will make payments in the future only. In any event, the only payments due to RFC after discharge will be those determined to be due to this party.

Debtor will make to Homecomings are those "determined to be due" Homecomings (presumably,

in the State Court Rescission Litigation).

## 2.

In construing the meaning and force of the Confirmed Plan, I begin by identifying the

legal principles that guide my interpretation of the plan provisions that are the subject of the

parties' dispute.

Many courts have employed the legal precept that a chapter 13 plan is a court-sanctioned

contract that binds the chapter 13 debtor and its creditors.  See, e.g., In re Harvey, 213 F.3d 318,

321 (7th Cir. 2000); In re Sims, 358 B.R. 217, 223 (Bankr. E.D. Pa. 2006); In re Turek, 346 B.R.

350, 354 (Bankr. M.D. Pa. 2006); In re Penrod, 169 B.R. 910, 916 (Bankr. N.D. Ind. 1994), aff'd

50 F.3d 459 (7th Cir. 1995).  In construing a confirmed plan of reorganization, courts apply

contract principles.  In re Shenango Group Inc., 501 F.3d 338, 344 (3d Cir. 2007).  Further, it is

generally accepted that the rules of contract interpretation are those of the law of the state in

which the plan was confirmed.  E.g. In re Dow Corning Corp., 456 F.3d 668, 676 (6th Cir. 2006);

Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n, 997 F.2d 581, 588 (9th Cir. 1993); In re

Turek, 346 B.R. at 354-55.[23]

---

[23]    Before proceeding further in the analysis, a cautionary note is warranted regarding the
analogy between confirmed chapter 13 plans and contracts.

The analogy may be most apt when analyzing the enforceability (as opposed to the
meaning) of the provisions of a chapter 13 plan.  In that context, conceptualizing a chapter 13 plan as a
contract is helpful in illustrating that a confirmed chapter 13 plan binds creditors just as a contract does.
See 11 U.S.C. §1327(a).  In effect, the terms of the confirmed plan modify or replace the terms of the
prepetition contracts between the debtor and his or her creditors.

The "confirmed plan-contract" analogy may be less precise in the context of a dispute

The Third Circuit Court of Appeals has summarized the cardinal principles of contract

construction under Pennsylvania law as follows:

> Pennsylvania contract law begins with the firmly settled point that the intent of the
> parties to a written contract is contained in the writing itself.  Where the intention
> of the parties is clear, there is no need to resort to extrinsic aids or evidence,
> instead, the meaning of a clear and unequivocal written contract must be
> determined by its contents alone. Where language is clear and unambiguous, the
> focus of interpretation is upon the terms of the agreement as manifestly expressed,
> rather than as, perhaps, silently intended.  Clear contractual terms that are capable
> of one reasonable interpretation must be given effect without reference to matters
> outside the contract.

Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc., 247 F.3d 79, 92-93 (3d Cir. 2001) (internal

quotations and citations omitted); accord In re Bryant, 323 B.R. at 639.

Under general rules of construction, contract terms should be given their plain and

---

requiring judicial interpretation of a provision of a confirmed plan.  Most notably, chapter 13 plans
frequently are created by a process that differs materially from contract formation.  See generally In re
Hay, 2008 WL 5158577, at *4 (Bankr. M.D. Pa., Nov. 13, 2008) (noting imperfection of analogy
between chapter 13 plan and a contact because there is no meeting of the minds or consideration in
approval of chapter 13 plan).  To elaborate further, when a proposed plan is served upon a creditor,
frequently, it does not represent the memorialization of the terms of a negotiated agreement.  Rather,
from the creditor's perspective it is likely a document prepared by an adverse party (the debtor), that sets
forth terms that may modify the parties' pre-bankruptcy contract relationship.  The bankruptcy process
then explicitly contemplates that a creditor may object to confirmation of the proposed plan if it believes
that the terms are not consistent with the Code, see Fed. R. Bankr. P. 3015(f), and readily obtain a
judicial determination of its rights.  Absent an objection, the creditor may be deemed to have consented
to the plan.  See In re Bryant, 323 B.R. 635, 639 (Bankr. E.D. Pa. 2005); accord In re Flynn, 2009 WL
566439, *4-5 (B.A.P. 1st Cir. March 6, 2009) (collecting authorities).


       Due to the differences discussed above, it may be more accurate to conceptualize a
chapter 13 plan that is confirmed without debtor-creditor negotiation, as a specialized type of contract –
perhaps more like a unilateral contract, rather than a classic, two-party negotiated contract.  Courts
construing such plans should take care not to apply woodenly the principles of contract construction
developed for contracts formed through bilateral negotiation.  See generally Bruch v. Firestone Tire and
Rubber Co., 828 F.2d 134, 147-48 (3d Cir. 1987) (rules of interpretation designed to help courts ascertain
the parties' intention in negotiated contacts may not be helpful in construing unilateral contracts), aff'd in
part, rev'd in part, 489 U.S. 101, 109 S. Ct. 948 (1989).

ordinary meaning.  11 Richard A. Lord, Williston on Contracts, § 32.3 (4th Ed. 2004).  Under

Pennsylvania contract law, a term is ambiguous if it is reasonably susceptible to different

meanings.  See USX Corp. v. Penn Cent. Corp., 130 F.3d 562, 566 (3d Cir. 1997); see also

McDowell v. Phila. Hous. Auth., 423 F.3d 233, 238 (3d Cir.  2005) (determination whether

contract is ambiguous is question of law that court decides by considering whether, from

objective standpoint, it is reasonably susceptible to at least two different interpretations).  In

making the determination whether an ambiguity exists, "a court must consider the words of the

agreement, alternative meanings suggested by counsel, and extrinsic evidence offered in support

of those meanings."  Kroblin Refrig. Xpress, Inc. v. Pitterich, 805 F.2d 96, 101 (3d Cir. 1986);

accord Hullett v. Towers, Perrin, Forster & Crosby, Inc., 38 F.3d 107, 111 (3d Cir. 1994); Mellon

Bank, N.A. v. Aetna Bus. Credit, Inc., 619 F.2d 1001, 1011 (3d Cir. 1980).[24]

     If a contract provision is ambiguous, two (2) consequences follow.  First, the meaning of

---

[24]     The Third Circuit Court of Appeals has pointed out that there are limits to the scope of
the court's consideration of extrinsic evidence in determining whether an ambiguity exists:

> It is important for present purposes to note that extrinsic evidence of the
> negotiations, conduct and other circumstances of the parties is important to a
> court's analysis of whether an agreement is ambiguous only to the extent, if any,
> that such evidence provides objective indicia that, from the linguistic reference
> point of the parties, the terms of the contract are susceptible of different
> meanings.  That is, extrinsic evidence is permitted because the law recognizes
> that the meaning of words can depend on context, and what may seem
> unambiguous without context (or in the context that the judge may hypothesize,
> based on his or her own experience) may be ambiguous when understood from
> the linguistic reference point of the parties. But the focus must remain on the
> language chosen by the parties, and a text unambiguous when accorded the
> commonly understood meaning of its words cannot be disregarded unless the
> extrinsic evidence is such as might cause a reasonable fact finder to understand
> the text differently.

American Cyanamid Co. v. Fermenta Animal Health Co., 54 F.3d 177, 181-82 (3d Cir. 1995) (quotation
marks and citations omitted).

the provisions are an issue of fact to be determined by the factfinder, rather than an issue of law.

E.g., Thomas Rigging & Const. Co., Inc. v. Contraves, Inc., 798 A.2d 753(Pa. Super. 2002).

Second, the parties may offer extrinsic evidence to clarify the meaning of the ambiguity.  See,

e.g., Einhorn v. Fleming Foods of Penna., Inc., 258 F.3d 192, 194-95 (3d Cir. 2001); Kripp v.

Kripp, 849 A.2d 1159, 1163-64 (Pa. 2004); Hutchison v. Sunbeam Coal Corp., 519 A.2d 385,

390 (Pa. 1986).

In this case, neither party offered any testimonial evidence to clarify the meaning of the

Confirmed Plan.  Thus, the court is limited to an analysis of the "four corners" the Confirmed

Plan, supplemented only by the text of the two (2) earlier versions of the plan proposed by the

Debtor prior to confirmation.  To resolve this dispute, the court must consider those documents

and employ time-honored principles in aid of the interpretation of contracts that have been

developed by the courts.[25]  See Restatement (Second) of Contracts §201-206 (West 2009) ("the

Restatement").[26]

---

[25]      In these circumstances, the construction of the meaning of the Confirmed Plan likely
remains a legal issue rather than a factual determination.  See In re Columbia Gas System Inc., 50 F.3d
233, 241 (3d Cir. 1995).

[26]      The courts in Pennsylvania routinely invoke the legal principles stated in the
Restatement when interpreting the meaning of contracts.  See Sunbeam Corp. v. Liberty Mut. Ins. Co.,
566 Pa. 494, 501-02, 781 A.2d 1189, 1193 (Pa. 2001) (quoting with approval Restatement (Second) of
Contracts §202(5)); Gustine Uniontown Assocs., Ltd. v. Anthony Crane Rental, Inc., 892 A.2d 830, 837
(Pa. Super. Ct. 2006) (citing with approval Restatement (Second) of Contracts §203(a)); Di Fabio v.
Centaur Ins. Co., 366 Pa. Super. 590, 593, 531 A.2d 1141, 1143 (Pa. Super. Ct. 1987) (citing Restatement
(Second) of Contracts §206 cmt. a); Motor Coils Mfg. Co. v. American Ins. Co., 308 Pa. Super. 568, 579,
454 A.2d 1044, 1050 (Pa. Super. Ct. 1982) (adopting Restatement (Second) of Contracts §202(1)).

**3.**

To reiterate, the inquiry here is to determine whether the Confirmed Plan provides that Homecomings may not obtain relief from the automatic stay until resolution of the State Court Rescission Litigation, even though relief would otherwise be available under 11 U.S.C. §362(d)(1) (because the Plan does not provide for payment of Homecomings' claim and the Debtor has not made any post-confirmation payments to Homecomings).  The Debtor contends that the Confirmed Plan negates §362(d)(1) and that Homecomings is bound by its terms.

I do not construe the Confirmed Plan as expansively as the Debtor.  As explained below, in the spare language employed, I find that the Confirmed Plan does not communicate an intent to dispense with the fundamental bankruptcy concept that a secured creditor's claim is entitled to relief from the automatic stay for cause (including the lack of adequate protection).

**4.**

In deconstructing the text of the Confirmed Plan, I focus first on the critical phrase in the third sentence of Paragraph 3: "the automatic stay will remain in effect" as to Homecomings. What does it mean for a chapter 13 plan to invoke this statutory concept and state that the "automatic stay" will retain its vitality after confirmation when, as a matter of law, the statutory automatic stay will remain in force anyway?[27]

In the absence of further qualification in a plan, it is both sensible and logical to interpret

---

[27]        In my experience, it is not uncommon for proponents of chapter 11 and chapter 13 reorganization/rehabilitation plans to include plan provisions that incorporate the content of Code provisions that are applicable post-confirmation.  Presumably, this practice occurs because proponents' counsel are cautious by nature: why dress one's client with a belt when the client can wear a belt and suspenders?  Yet, if a plan provision does nothing more than reference a statutory term or incorporate a statutory provision, it is difficult to see what it adds to the statutory protections.

a plan provision that invokes the well-known statutory term "automatic stay" to be co-extensive

with the statute, incorporating by reference the entire bundle of benefits and obligations that the

statutory provision (11 U.S.C. §362) grants and imposes on parties in interest in a bankruptcy

case.  Thus, a plan's unqualified reference to the generic term "automatic stay" should be read to

incorporate not only §362(a), the provision that defines the scope of the stay, but also §362(c),

the provisions that governs the "natural" expiration of the stay and §362(d), the provision that

permits a creditor, in certain circumstances, to obtain an order modifying or terminating the stay

prior to its "natural," statutory expiration date.

　　　　The present case is not so simple.  The third sentence of Paragraph 3 of the Confirmed

Plan <u>does</u> qualify the statement that the automatic stay will remain in effect by stating that it will

remain in effect "[in order] to prevent the Borrowers from losing their residence prior to

resolution of the validity of the rescission."  However, this provision is ambiguous.  It can be

read merely to state the purpose of maintaining the automatic stay in place, rather than having

any independent legal force.  Alternatively, it can be read to be a substantive, binding plan

provision that addresses the duration of the automatic stay after confirmation.  Even so, it

remains ambiguous.  It can be read in a limited fashion, as modifying only §362(c)(1) and (2),

replacing the statutory end date for the automatic stay (<u>i.e.</u>, entry of discharge or the closing of

the case) with a different date (<u>i.e.</u>, "resolution of the State Court Rescission Litigation –

whatever the exact meaning of "resolution" may be).  Read in this fashion, the third sentence of

Paragraph 3 simply "retires" the automatic stay at a point in time other than that prescribed by

§362(c)(1) – possibly earlier, possibly later.[28]  Or, as the Debtor urges, it can be read more
expansively to negate §362(d) and provide that the resolution of the State Court Rescission
Litigation is the exclusive basis for the expiration, modification or termination of the stay.  The
text of the Confirmed Plan is so sparse that it simply is not clear on this point.

    To be sure, certain language in the Confirmed Plan lends support to the expansive
interpretation urged by the Debtor.  The Plan, albeit a bit indirectly, does state that Homecomings
cannot expect to receive any payments from the Debtor until the respective rights of the Debtor
and Homecomings are determined in the State Court Rescission Litigation.  For example, the
second sentence of Paragraph 3 is written in the future tense (the Borrowers "will make
payments" that "are found to be due").  Further, while the subject matter of Paragraph 9 seems to
be the Debtor's post-discharge relationship with Homecomings (as opposed to the post-
confirmation, pre-discharge relationship), the second sentence states that the Debtor anticipates
that the State Court Rescission Litigation "will result in a resolution pursuant to which [the
Borrowers] will make payments in the future only." (emphasis added).[29]  Arguably, these

---

[28]    This is because the State Court Rescission Litigation might take longer to resolve than
the term of the Confirmed Plan.  Query whether a confirmed chapter 13 plan that is fully performed can
provide for a stay against actions against property of the debtor that remains in place after the entry of
discharge and/or the closing of the case?

[29]    The progression of the Debtor's proposed treatment of Homecomings' secured claim
from the First Plan to the Second Amended Plan (the Confirmed Plan) should have communicated to
Homecomings that the Debtor would not be making periodic payments.  Paragraph 3 of the initial Plan
stated that the Debtor and his spouse "will continue to make at least partial post-petition payments to
[Homecomings] to protect their interests in the event that [the TILA rescission] is not entirely
successful." (Docket Entry No. 4).  Paragraph 3 of the Debtor's Amended Plan states that the Debtor and
his spouse "have been unable to make even partial post-petition mortgage payments to [Homecomings]."
(Docket Entry No. 22).  Paragraph 3 of the Confirmed Plan then states, in the future tense, that any
payments "found to be due" to Homecomings will be paid "outside the plan."

28

provisions give added meaning to the second sentence of Paragraph 3, which states: "However, the automatic stay will remain in effect" as to Homecomings.  Indeed, the use of the word "however" suggests that the automatic stay will remain in effect despite conditions that otherwise would result in its modification or termination.  Read in this manner, it is possible to find embedded in Paragraph 3 the notion that Homecomings may not invoke §362(d).

This expansive reading of the third sentence of Paragraph 3 also finds support from the statement of its purpose: "to prevent the Borrowers from losing their residence" prior to "resolution" of the State Court Rescission Litigation.  Given the Debtor's inability to make periodic payments to Homecomings during the pendency of the State Court Rescission Litigation, it arguably would serve no purpose for the Plan to expressly provide for the automatic stay to remain in effect post-confirmation to protect the Residence if relief from stay was virtually certain to be granted upon request of Homecomings because the Confirmed Plan does not provide for Homecomings' claim and the Debtor is unable to make adequate protection payments.

These textual clues suggest that Paragraph 3 may mean that the automatic stay is to remain in place until resolution of the State Court Rescission Litigation notwithstanding the existence of "cause" or lack of adequate protection under 11 U.S.C. §362(d)(1).  See Restatement (Second) of Contracts §202(1) (West 2009) ("if the principal purpose of the parties is ascertainable it is given great weight" in interpreting a contract); see also id. §203(a) (interpretation that gives an effective meaning to all the terms is preferred to an interpretation which leaves a part of no effect).

There are, however, at least two (2) weighty counter-arguments that provide support to

Homecomings.

First, as stated above, the third sentence of Paragraph 3 can be read as modifying only the operation of §362(c), thereby "retiring" the automatic stay at a point in time other than its natural termination point under that section of the statute. This interpretation, that Paragraph 3 addresses only §362(c) and not §362(d), is strongly supported by a comparison of the text of Paragraphs 3 and 8. Paragraph 8, which I find does not apply to Homecomings,[30] explicitly narrows the grounds for the grant of "relief" from the automatic stay – using the same word ("relief") as is employed in §362(d). Thus, it seems clear that Paragraph 8 is intended to address termination of the automatic stay under §362(d). By comparison, Paragraph 3 contains no language that refers to "relief" from the automatic stay. Rather, Paragraph 3 states only that the automatic stay "will remain in effect" (until "resolution" of the State Court Rescission Litigation). The use of the words "remain in effect" evokes §362(c), the subsection of §362 that refers to the time period in which the automatic stay "continues." "Remaining in effect" and "continuing" seem to be

---

[30]     Paragraph 8 contains a provision that, at first blush, also appears relevant: "After confirmation of the plan, relief shall be granted only for a material violation of the terms of payment to the trustee under the terms of the plan and only after a motion and notice and a hearing thereon." However, I do not read Paragraph 8 to apply to Homecomings.

Paragraph 8 states, without qualification, that the automatic stay will remain in place until the case is closed. This is inconsistent with Paragraph 3, which states that the stay will remain in place until resolution of the State Court Rescission Litigation. As a result, I conclude that Paragraph 3 applies only to Homecomings while, without explicitly saying so, Paragraph 8 applies only to creditors other than Homecomings. See Restatement §203 (specific terms and exact terms are given greater weight than general language).

Further, it would be anomalous to read the Plan to restrict the §362(d) rights of a secured creditor that is not receiving a distribution from the chapter 13 trustee only upon the debtor's failure to make plan payments to the trustee. See Restatement §203(a) (interpretation that results in a reasonable meaning is preferred to an interpretation leading to unreasonable result).

slightly different ways of expressing the same concept.  This textual comparison of Paragraphs 3 and 8 suggests that Paragraph 3 modifies §362(c) only and does not restrict Homecomings' rights under §362(d).

Further, and perhaps more fundamentally, the concept that a secured creditor is entitled to adequate protection of its interest while being restrained in a bankruptcy proceeding from exercising its property rights under applicable nonbankruptcy law is deeply ingrained in bankruptcy jurisprudence.  This restraint on the creditor's property rights in the interest of permitting a debtor the opportunity to financially rehabilitate is subject to the condition that the creditor's property interest be adequately protected and therefore, that the value of the creditor's property rights not erode while the debtor attempts to implement its rehabilitation plan.

To override the application of the cardinal bankruptcy principle that secured creditors are entitled to adequate protection of their property interests, based primarily on an inference drawn from a single word (i.e., "however") in a confirmed chapter 13 plan, arguably infuses that word with more meaning than it can reasonably bear.  Even with Paragraph 3's reference to the "purpose" of the automatic stay and the other contextual clues as to the meaning of Paragraph 3, it is doubtful, at best, that a secured creditor conscientiously reading the elliptical language of this plan would easily understand that the plan provides both that it will not be paid and that its adequate protection rights under §362(d) are being negated.  Such a reading of the Confirmed Plan is jarring to parties who participate in title 11 reorganization and rehabilitation proceedings. One might reasonably argue that such an outcome demands a greater degree of clarity than exists in the Confirmed Plan.  See generally Restatement §202(5) (manifestations of intention of the parties are interpreted as consistent with any relevant course of performance, course of dealing,

31

or usage of trade); id. §203(a) (interpretation which gives a reasonable, lawful, and effective

meaning to all the terms is preferred to an interpretation which provides an unreasonable or

unlawful result).


**5.**

After carefully considering the competing interpretations of the Confirmed Plan, I find

them in equipoise.  On the one hand, I have ambiguous plan language that includes several hints

supporting the broad meaning offered by the Debtor.  On the other hand, there are countervailing

textual inferences that can be drawn from the language of the plan and, in the context of a chapter

13 rehabilitation case, the Debtor's interpretation of an ambiguous plan provision is

counterintuitive, suggesting that a greater degree of clarity was essential.  Both parties'

interpretations of this woefully ambiguous chapter 13 plan are plausible, but there were no

negotiations between the parties, leaving me with no extrinsic evidence (other than the text of the

prior filed plans) to guide the process of discerning the meaning of the Confirmed Plan.  Some

principle is required to serve as a "tie breaker."  Accordingly, I will apply the doctrine of contra

proferentem ("against the offeror") and construe the Confirmed Plan against the Debtor.

Properly understood, the doctrine of contra proferentem is a rule of policy, not a rule of

interpretation.  As observed in one well-respected treatise,

> The rule is not actually one of interpretation, because its application does not
> assist in determining the meaning that the two parties gave to the words, or even
> the meaning that a reasonable person would have assigned to the language used. It
> is chiefly a rule of policy, generally favoring the underdog. It directs the court to
> choose between two or more possible reasonable meanings on the basis of their
> legal operation, i.e., whether they favor the drafter or the other party.

5 Arthur L. Corbin & Margaret N. Kniffin, Corbin on Contracts §24.27 (rev. ed. 2007).

The doctrine of <u>contra proferentem</u> traditionally has been described as serving three (3)

purposes: (1) it encourages parties to be careful with their words; (2) it favors upholding rather

than striking executed acts; and (3) it allows for judicial economy.  Bradley D. Liggett, <u>Contra</u>

<u>Applicantem or Contra Proferentem Applicatio: the Need for Clarification of the Doctrine of</u>

<u>Contra Proferentem in the Context of Insured-created Ambiguities in Insurance Applications</u>,

2008 B.Y.U. L. Rev. 211, 213-14 (2008) (citing 3 Francis Bacon, <u>The Elements of the Common</u>

<u>Laws of England</u>, in The Works of Francis Bacon 225 (1857)).

With respect to the first purpose, the Restatement elaborates as follows:

> Where one party chooses the terms of a contract, he is likely to provide more
> carefully for the protection of his own interests than for those of the other party.
> He is also more likely than the other party to have reason to know of uncertainties
> of meaning. Indeed, he may leave meaning deliberately obscure, intending to
> decide at a later date what meaning to assert. In cases of doubt, therefore, so long
> as other factors are not decisive, there is substantial reason for preferring the
> meaning of the other party.

<u>Restatement</u> §206 cmt. a.

The doctrine is applied most frequently, although not exclusively, in cases involving

insurance contracts and other contracts where there is unequal bargaining power between the

parties.  <u>Id</u>. ("The rule is often invoked in cases of standardized contracts and in cases where the

drafting party has the stronger bargaining position, but it is not limited to such cases.").

The doctrine of <u>contra proferentem</u> is applied only in limited circumstances.  As the

Pennsylvania Supreme Court has cautioned:

> [T]he rule is not intended as a talismanic solution to the construction of
> ambiguous language. . . .  Where a document is found to be ambiguous, inquiry
> should always be made into the circumstances surrounding the execution of the
> document in an effort to clarify the meaning that the parties sought to express in
> the language which they chose.  It is only when such an inquiry fails to clarify the
> ambiguity that the rule of construction relied upon by the chancellor should be

33

> used to conclude the matter against that party responsible for the ambiguity, the
> drafter of the document.

Burns Mfg. Co. v. Boehm, 356 A.2d 763, 767 n.3 (Pa. 1976) (citations omitted); accord M. F.

Restoration Co. v. Elliott, Bray & Riley, 1994 WL 719731, at *2 (E.D. Pa. Dec. 22, 1994).  For

the reasons expressed in Boehm, the doctrine also has been described as a "rule of last resort" or

a "tie breaker," invoked when no other sound basis exists for choosing one contract interpretation

over another.  Gardiner, Kamya & Assocs, P.C. v. Jackson, 467 F.3d 1348, 1353 (Fed. Cir.

2006); accord Pitcher v. Principal Mut. Life Ins. Co., 870 F. Supp. 903, 915 (S.D. Ind. 1994),

aff'd 93 F.3d 407 (7th Cir. 1996); see also Taylor v. Continental Group Change in Control

Severance Pay Plan, 933 F.2d 1227, 1233-34 (3d Cir. 1991) (applying same principle in context

of construing ambiguous provision of non-bargained severance plan).

  In the bankruptcy context, without extended discussion, some courts have applied the

doctrine of contra proferentem to construe ambiguous bankruptcy reorganization or rehabilitation

plan provisions against the drafter.  See, e.g., In re Whitney, 2008 WL 227868 (D. Mont. Jan. 28,

2008); In re Mershon, 2005 WL 4030035 (Bankr. S.D. Ohio July 21, 2005); In re Collins, 184

B.R. 151 (Bankr. N.D. Fla. 1995); In re Harstad, 155 B.R. 500 (Bankr. D. Minn. 1993), aff'd

1994 WL526013 (D. Minn Jan. 20, 1994); aff'd 39 F.3d.898 (8th Cir.1994); see also In re

Brawders, 325 B.R. 405 (B.A.P. 9th Cir. 2005) (applying doctrine, but also articulating policy

reasons therefor).  The propriety of this liberal use of the doctrine, before the court attempts to

resolve the meaning of the ambiguous plan provision, is questionable.

  Further, restricting the use of the doctrine to those cases in which the court is unable to

resolve the meaning of the ambiguous provision (rather than immediately construing the

ambiguity against the drafter) finds support in decisions suggesting that creditors have an

obligation to contest confirmation of proposed plans containing ambiguous provisions or provisions that may otherwise be objectionable.[31]  In short, a court's conclusion that a plan provision is ambiguous does not dictate that the interpretation of a creditor that did not object to confirmation should prevail.  A creditor that fails to object to confirmation and later disputes the debtor's interpretation of the plan is subject to the ordinary process of judicial interpretation of bankruptcy rehabilitation/reorganization plans in which the court may find that either party has the "better" interpretation of an ambiguous provision after applying accepted legal principles employed in interpreting the meaning of such plans.

Here, where the plan provisions at issue are susceptible to two (2) contrary, plausible interpretations and accepted principles employed by the courts to aid in the interpretation of contracts can be invoked to support both interpretations and I am left unable to discern whether the Confirmed Plan negates the post-confirmation application of 11 U.S.C. §362(d)(1), I find it appropriate to invoke the doctrine of contra proferentem.  Thus, the Debtor cannot prevail on the issue.


## IV.  CONCLUSION

For the reasons set forth above, I conclude that Homecomings' Motion for Reconsideration should be granted.  Because the Confirmed Plan does not provide for Homecomings' secured claim under 11 U.S.C. §1325(a)(5)(B) or §1322(b) and the Debtor has

---

[31]    See In re Harvey, 213 F.3d at 322 ("[I]t is perfectly reasonable to expect interested creditors to review the terms of a proposed plan and object if the terms are unacceptable, vague, or ambiguous"); In re Szostek, 886 F.2d 1405, 1414 (3d Cir. 1989) (creditors must take an active role in confirmation process to protect their rights); In re Bryant, 323 B.R. at 639 ("plans that would not be confirmable due to provisions that do not conform to applicable law will nonetheless be given effect if no objection is raised prior to entry of the confirmation order").

failed to make periodic payments to Homecomings or otherwise provide Homecomings with adequate protection of its property interest, I find that Homecomings is entitled to relief from the automatic stay under 11 U.S.C. §362(d)(1).  I find further that the provisions of the Confirmed Plan, binding on Homecomings, do not preclude relief under §362(d)(1).  To the extent that the Debtor seeks to stay Homecomings from the exercise of its state court foreclosure remedies based on the pendency and alleged merits of his claims in the State Court Rescission Litigation, he will need to press that request in state court.

Date:  March 15, 2009

_____
ERIC L. FRANK
U.S. BANKRUPTCY JUDGE